Patricia W. BUCE, Plaintiff-Appellee,

v.

ALLIANZ LIFE INSURANCE COMPANY, f.k.a. North American Life and Casualty Company, Defendant-Appellant.

No. 99-15405.

United States Court of Appeals,

Eleventh Circuit.

April 10, 2001.

P/C Concurring Opinion

Appeal from the United States District Court for the Northern District of Georgia. (NO. 98-00112-CV-TWT-1), Thomas W. Thrash, Judge.

Before CARNES and BARKETT, Circuit Judges, and POLLAK[*], District Judge.

POLLAK, District Judge:

This appeal presents questions arising from the denial—initially by the plan administrator and then by the insurance carrier—of death benefits claimed under an employer-sponsored personal injury insurance policy governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* On "heightened arbitrary and capricious" review by the District Court, the denial of benefits was overturned and the plaintiff—the widow of the decedent—was awarded $150,000, the face amount of the policy. On appeal to this court, the insurance carrier contends that the District Court erred, under ERISA, (1) in its rejection of the carrier's interpretation of the policy term "bodily injury caused by an accident ... and resulting directly and independently of all other causes in loss covered by the policy" as applied to the facts of the decedent's death, and (2) in its rejection of the carrier's reliance on the policy's intoxication exclusion provision as an alternative ground for denial of the claimed benefits. The insurance carrier also argues that the proper standard of District Court review of the denial of benefits was not "heightened arbitrary and capricious" but "arbitrary and capricious."

In Part I of this opinion we outline the principal facts giving rise to the plaintiff's claim and the manner in which the claim was addressed by, *first,* the plan administrator and, *second,* the insurance carrier. In Part II, we summarize the history of the case after it came to court—first, a Georgia state court and then,

---

[*]Honorable Louis H. Pollak, U.S. District Court for the Eastern District of Pennsylvania, sitting by designation.

on removal, the District Court. In Part III we consider the contentions made by the insurance carrier on appeal.

I

Walter H. Buce, Jr., a Georgia resident, was employed by National Services Industries, Inc. ("NSI"), a company located in Atlanta. In 1985 Mr. Buce elected to become insured under a group Personal Accident Insurance Plan provided by NSI as an optional employee benefit. The accident insurance plan—originally underwritten by Fireman's Fund, Inc., but taken over, in 1993, by Allianz Life Insurance Company of North America ("Allianz")—provided that: "The Plan is to be interpreted in accordance with the laws of the State of Georgia." On December 13, 1995, at about 2:00 a.m., Mr. Buce, was killed in a single-vehicle crash on Interstate 75 near Cleveland, Tennessee. There were no passengers or other witnesses. A posthumously drawn blood sample measured Mr. Buce's alcohol level as .22 percent.

Mr. Buce's widow, Patricia W. Buce, the beneficiary of her husband's accident policy, filed a claim. NSI, Mr. Buce's employer, referred the claim to Allianz, the insurance carrier. Allianz in turn referred the claim to American Special Risk Management ("ASRM"), the company retained by Allianz to act as administrator of the insurance plan; as of that time, Allianz was ASRM's sole client.

On March 12, 1996, ASRM, in a letter written by its Claims Director, Edward F. Carroll, denied Mrs. Buce's claim. The substance of Mr. Carroll's decision was as follows:

> This Policy provides a "Loss of Life Accident Indemnity. When injury results in the loss of life of the Insured Person". The Policy also states the following:

20.  The Company shall not be liable for any loss sustained in consequence of the person whose injury is the basis of a claim being intoxicated or under the influence of any narcotic unless administered on the advise [*sic* ] of a physician.

> We have obtained the Cleveland Police Department report that indicated this single car accident happened when the car "left the roadway on the right hand shoulder of the road striking the guard rail". The Tennessee Bureau of Investigation's Forensic Services Crime Laboratory report on Alcohol, indicated the insured's level was twice the legal limit permitted to operate a vehicle. We therefore, must deny any Accidental Death Benefits for this accident, under the terms of this policy.

Mrs. Buce's attorney, John E. Robinson, took issue with Mr. Carroll's decision in a letter dated May 9, 1997. Mr. Robinson's letter was referred to Douglas Campbell, Allianz's attorney. On July 11, 1997 Mr. Campbell wrote to Mr. Robinson reaffirming the denial of Mrs. Buce's claim:

> This Firm represents Allianz Life Insurance Company of North America [the "Company"] and your letter of May 9, 1997, regarding the above referenced claim has been referred to us for response ....

> [T]he Company has, at your request, re-evaluated this claim and the materials you have submitted in support thereof. This is an accident policy which, as applicable to this particular claim,

provides payment of benefits where loss of life is due to bodily injury caused by an accident and resulting directly and independently of all other causes in death. As such, it is an "accidental means" policy which requires that, in the act which preceded the injury, there must have occurred something sudden, unexpected and unforeseen. In the first instance, the materials you have submitted do not show any positive identification of the individual found in the wrecked automobile as in fact being Mr. Buce, even though the death certificate states that it was. Moreover, even if the body was that of Mr. Buce, tests revealed that, several hours after the wreck, there was present a blood alcohol level of .22%, which would mean that Mr. Buce was intoxicated at the time of the wreck. Given the weather and road conditions as reported by the authorities, and the lack of any evidence of vehicular malfunction, it appears that Mr. Buce's injuries were occasioned by his voluntary ingestion of alcohol and were therefore not "bodily injuries cause[d] by an accident" as required by the coverage provisions of the Policy.

Furthermore, the Policy contains the following exclusion:

20.     The Company shall not be liable for any loss sustained in consequence of the person whose injury is the basis of claim being intoxicated ...

As the Policy contains no definition of intoxication, the common law definition would apply—namely, that the person was materially impaired from guarding himself against casualty or injury. A person with a .22% (or higher at the time of the wreck) blood alcohol level is undoubtedly materially impaired within the meaning of that definition. As discussed in the preceding paragraph, it was this impairment which caused the wreck that resulted in Mr. Buce's death.

For the foregoing reasons, and based entirely on the information available to us at this time, including the information you submitted in support of the claim, the Company, upon reconsideration, again denies the claim.

On December 5, 1997, in response to a further letter from Mr. Robinson, Debra Libby, NSI's Assistant Counsel, stated that "we regret that this unfortunate event occurred, but the claim does not appear to be covered by the Plan."

II

Six days later—on December 11, 1997—Mrs. Buce filed this law suit, naming as defendants NSI, ASRM and Allianz (the latter was originally sued under its former name, North American Life and Casualty Company). Suit was brought in the Superior Court of Fulton County, Georgia. Invoking ERISA, the defendants removed the case to the United States District Court for the Northern District of Georgia.

After granting in part and denying in part motions for summary judgment filed by the defendants, the District Court conducted a two-day bench trial. Shortly thereafter, the District Court filed its opinion awarding judgment in Mrs. Buce's favor, against Allianz, for the policy proceeds of $150,000, plus prejudgment and postjudgment interest. "The denial of benefits was arbitrary and capricious," the District Court ruled, "and the Plaintiff is entitled to the death benefit due under the Plan." *Buce v. National Service Industries, Inc., et al.,* 74 F.Supp.2d 1272, 1280 (N.D.Ga.1999). Finding no "breach of fiduciary duty," *id.,* on the part of ASRM and NSI, the District Court directed the entry of judgment in favor of those defendants.

In ruling against Allianz, the District Court came to a series of conclusions:

(A) The first issue addressed by the District Court was the standard of review under which it was to judge the correctness of Allianz's denial of benefits. The District Court noted that the Supreme Court, in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), had held that "a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan .... Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' " In the case at bar, the District Court found that *de novo* review was not an option, since the policy's Summary Plan Description provided that "[t]he insurance company has the exclusive right to interpret the provisions of the Plan, so its decision is conclusive and binding." 74 F.Supp.2d at 1275. The District Court pointed out, however, that, in conformity with *Firestone* 's admonition about conflicts of interest, the very deferential "arbitrary and capricious" standard requires modification where the insurance carrier is the effective decision-maker. As the District Court observed, this court has had several occasions to address this problem, most notably in *Brown v. Blue Cross and Blue Shield of Alabama, Inc.,* 898 F.2d 1556, *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991), and *Buckley v. Metropolitan Life,* 115 F.3d 936 (11th Cir.1997). In *Buckley,* so the District Court noted, we said that the less deferential "heightened arbitrary and capricious standard must be used when the plan was administered by an insurance company which paid benefits out of its own assets." 115 F.3d at 939. Applying these teachings to the role of Allianz in relation to Mrs. Buce's claim, the District Court concluded that the case before it was controlled by *Brown v. Blue Cross and Blue Shield of Alabama, Inc.* "There, Blue Cross determined whether it would pay benefits from its own coffers—an inherent and obvious conflict of interest. The situation here differs only slightly with ASRM evaluating Plaintiff's claim for its only client and then a final decision by Allianz. Therefore, the Court may review the determination of benefits under the heightened arbitrary and capricious standard." 74 F.Supp.2d at 1276. The impact of this ruling was, according to the District Court, that: "First, the Court must determine whether under a *de novo* review Plaintiff has offered a sufficiently sound interpretation of the disputed plan provision to rival the Defendants' contrary determination .... Second, the Court must determine whether the fiduciary's adoption of the different interpretation was 'arbitrary and capricious.' " *Id.*

(B) Mr. Buce's policy provided coverage for "bodily injury caused by an accident ... and resulting directly and independently of all other causes in loss covered by the policy." In the July 11, 1997 letter of Allianz's attorney, reaffirming the denial of Mrs. Buce's claim, the carrier's position was that "[t]his is an accident policy which, as applicable to this particular claim, provides payment of benefits where loss of life is due to bodily injury caused by an accident and resulting directly and independently of all other causes in death. As such, it is an 'accidental means' policy which requires that, in the act which preceded the injury, there must have occurred something sudden, unexpected and unforeseen .... [I]t appears that Mr. Buce's injuries were occasioned by his voluntary ingestion of alcohol and were therefore not 'bodily injuries cause[d] by an accident' as required by the coverage provisions of the Policy." The District Court discussed the legal sufficiency of the carrier's position as follows:

> The first question to be addressed is whether the insurance company properly interpreted the Plan by reading into the policy an exclusion for injury or death that is foreseeable based upon such risk increasing behavior as driving while intoxicated. In *Laney v. Continental Ins. Co.,* 757 F.2d 1190 (11th Cir.1985), the Eleventh Circuit addressed this issue in the context of a diversity case applying Georgia law. The decedent in that case died of acute alcohol poisoning; the autopsy showed a blood alcohol content of .47 grams percent. The court recognized that Georgia law distinguishes between the terms "accidental injury" and "injuries resulting from accidental means." *Id.* at 1191. Applying Georgia law, the court concluded that "caused by accident" is synonymous with "accidental means." *Id.* at 1192. "The focus is on the occurrence or happening which produces the result, not the result itself." *Id.* The court then concluded:

>> Given this construction of the policy term, it is evident that the defendant was entitled to judgment as a matter of law. Mrs. Laney does not dispute that her husband intentionally and voluntarily drank the alcohol that caused his death. Nor does she contend that some mischance, slip or mishap occurred during his consumption of the whiskey and beer to cause him to consume more than he intended. Although the result of his drinking was unexpected, the act of drinking was intentional. Georgia law makes it clear that such conduct is not covered by an "accidental means" policy.

> *Id. See also Continental Assurance Company v. Rothell,* 227 Ga. 258, 181 S.E.2d 283 (1971). A reasonable person would have foreseen that driving with a blood alcohol level of .22 grams percent was highly likely to result in injury or death. If *Laney* or Georgia law applies to this case, the court should enter judgment in favor of the Defendants and against the Plaintiff. Nevertheless, it is also unquestionably true that the ordinary purchaser of an accidental death insurance policy would think that the unintentional and unexpected burning to death as a result of a car wreck constitutes death by accident.

> The Eleventh Circuit has clearly held that ERISA preempts state law and authorizes federal courts to create federal common law to implement Congress' statutory scheme. *Branch v. G. Bernd Co.,* 955 F.2d 1574, 1580 (11th Cir.1992). In this case, the Court is faced with the question of whether to frustrate the statutory scheme of ERISA by adhering to the metaphysical distinction between "accidental means" and "accidental results" that has bedeviled the courts for more than 60 years ....

>> ...The Eleventh Circuit has clearly stated the process for determining ERISA common law.

>> To decide whether a particular rule should become part of ERISA's common law, courts must examine whether the rule, if adopted, would further ERISA's scheme and goals.

> ERISA has two central goals: (1) protection of the interests of employees and their beneficiaries in employee benefit plans; and (2) uniformity in the administration of employee benefit plans.

*Horton v. Reliance Standard Life Ins. Co.,* 141 F.3d 1038, 1041 (11th Cir.1998) (citations omitted). Reading a foreseeability exclusion into the policy would frustrate the Congressional purpose of protecting ERISA plan beneficiaries. It would not contribute to uniformity in the administration of employee benefit plans. A foreseeability exclusion contributes to uncertainty and difficulty of administration. "[A]n insured should not have to consult a long line of case law or law review articles and treatises to determine the coverage he or she is purchasing under an insurance policy."

74 F.Supp.2d at 1276, 1279.

Accordingly, the District Court concluded "that Allianz applied an incorrect legal standard to the determination of whether Mr. Buce died as a result of an accident." *Id.* at 1279.

(C) Finally, the District Court rejected Allianz's alternative contention that Mrs. Buce's claim was, in any event, barred by the policy's intoxication exclusion provision, which read: "The Company shall not be liable for any loss sustained in consequence of the person whose injury is the basis of claim being intoxicated or under the influence of any narcotic unless administered on the advice of a physician." The District Court found that the 1985 Summary Plan Description, a portion of a plan booklet furnished to Mr. Buce, "contained a list of policy exclusions that did not include an exclusion for injuries due to intoxication." *Id.* The 1993 plan booklet contained a Summary Plan Description which did include an intoxication exclusion provision, but the District Court found, on the basis of NSI's answers to interrogatories, that "the 1985 Summary Plan Description was the only one ever issued to either Mr. or Mrs. Buce," *id.* at 1274, with the result that the 1985 Summary Plan Description was to be treated as the operative one. And as between the 1985 Summary Plan Description and the text of the policy, the District Court, citing our decision in *McKnight v. Southern Life and Health Ins. Co.,* 758 F.2d 1566, 1570 (11th Cir.1985), concluded that "[w]hen a summary plan document conflicts with the plan, the summary controls." *Id.* at 1279.

### III

On appeal, Allianz challenges each of the District Court's rulings.

The first ruling—that "heightened arbitrary and capricious" review is the proper standard for federal court review of the benefits denial in this case—is, as a matter of law, unassailable, for the reasons cogently stated by the District Court. ASRM—the plan administrator, and author of the initial denial of Mrs. Buce's claim—was dependent on the patronage of Allianz. And on review of ASRM's decision, Allianz, in stating through its attorney in the July 11, 1997 letter, that it "ha[d]...reevaluated this claim," was exercising its ultimate authority to determine for itself whether payments should be made out of its own assets—an

authority which then led it, "upon reconsideration," to conclude that it "again denies the claim." This is precisely the conflict-of-interest setting which—under this court's case law, carefully analyzed by the District Court—calls for "heightened arbitrary and capricious" review.

In its opening brief on appeal, Allianz undertakes to deflect the District Court's exercise of "heightened arbitrary and capricious" review by arguing that "notwithstanding a conflict of interest, the heightened arbitrary and capricious test does not apply if the administrator's interpretation of the plan language is correct." We think, however, that it is not the correctness of the *administrator* 's interpretation—namely, that the intoxication exclusion barred Mrs. Buce's claim—which is chiefly at issue. We think, rather, that what is chiefly at issue is the correctness of the *insurance carrier* 's interpretation, for that was the final and controlling rationale for the denial of benefits. To be sure, the insurance carrier did invoke the intoxication exclusion provision, but that ground was alternative, and ancillary, to its principal basis for denying Mrs. Buce's claim—namely, that Mr. Buce's policy was "an 'accidental means' policy which requires that, in the act which preceded the injury, there must have occurred something sudden, unexpected and unforeseen," and that "Mr. Buce's injuries were occasioned by his voluntary ingestion of alcohol and were therefore not 'bodily injuries cause[d] by an accident' as required by the coverage provisions of the Policy." The District Court, in the second of its three rulings, rejected that interpretation, holding that "accidental means" doctrine, while good law in Georgia, was not a permissible ingredient of a benefits plan governed by ERISA. To the correctness of that ruling, which is subject to plenary review by this court, we now turn.

The District Court, in the portion of its analysis quoted above (in Part II(B) of this opinion), noted that Georgia is an "accidental means" jurisdiction, as recognized by this court in *Laney v. Continental Ins. Co.,* 757 F.2d 1190 (11th Cir.1985), and went on to observe that "[i]f *Laney* or Georgia law applies to this case, the Court should enter judgment in favor of the Defendants and against the Plaintiff." 74 F.Supp.2d at 1276. However, the District Court, finding limited value in "accidental means" doctrine, concluded that, since the case at bar is not, like *Laney,* a diversity case, but an ERISA case, the Georgia law of "accidental means" was not controlling. Specifically, the District Court ruled—correctly—that when a federal court construes an ERISA-regulated benefits plan, the federal common law of ERISA supersedes state law. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Horton v. Reliance Standard Life Ins. Co.,* 141 F.3d 1038, 1041 (11th Cir.1998); *Todd v. AIG Life Ins. Co.,* 47 F.3d 1448, 1451 (5th Cir.1995). Finding "accidental means" doctrine to be incompatible with "the developing ERISA federal

common law," 74 F.Supp.2d at 1278, the District Court held that "it is arbitrary and capricious for an insurer to deny a claim based upon an interpretation of 'accident' that is not stated in the policy and that is contrary to the expectations of the ordinary insured." *Id.* at 1279.

In the portion of the District Court's opinion quoted at some length in Part II(B) of this opinion, *supra,* the District Court referred to "the metaphysical distinction between 'accidental means' and 'accidental results' that has bedeviled the courts for more than 60 years." The "more than 60 years" was a reference back to the Supreme Court's decision in *Landress v. Phoenix Ins. Co.,* 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934 (1934). *Landress* was a pre-*Erie*[1] diversity case. The decedent died of sunstroke while playing golf. The decedent's widow sought to recover on two accident insurance policies. One policy provided coverage for death resulting "directly and independently of all other causes from bodily injuries effected through external, violent and accidental means, and not directly or indirectly, wholly or partly from disease or physical or mental infirmity." The other policy provided coverage for death resulting "from bodily injuries effected directly and independently of all other causes through external, violent and accidental means." On certiorari, the Court reviewed a judgment of the Sixth Circuit, 65 F.2d 232, affirming the district court's dismissal of the complaint. The Court affirmed. Speaking through Justice Stone, the Court explained:

> Petitioner argues that the death, resulting from voluntary exposure to the sun's rays under normal conditions, was accidental in the common or popular sense of the term and should therefore be held to be within the liability clauses of the policies. But it is not enough, to establish liability under these clauses, that the death or injury was accidental in the understanding of the average man—that the result of the exposure "was something unforeseen, unsuspected, extraordinary, an unlooked for mishap, and so an accident," see *Lewis v. Ocean Accident & G. Corp.,* 224 N.Y. 18, 21, 120 N.E. 56; see also *Aetna Life Ins. Co. v. Portland Gas & Coke Co.,* 229 Fed. 552—for here the carefully chosen words defining liability distinguish between the result and the external means which produces it. The insurance is not against an accidental result. The stipulated payments are to be made only if the bodily injury, though unforeseen, is effected by means which are external and accidental. The external means is stated to be the rays of the sun, to which the insured voluntarily exposed himself. Petitioner's pleadings do not suggest that there was anything in the sun's rays, the weather or other circumstances, external to the insured's own body and operating to produce the unanticipated injury, which was unknown or unforeseen by the insured ....

> This distinction between accidental external means and accidental result has been generally recognized and applied where the stipulated liability is for injury resulting from an accidental external means .... And injury from sunstroke, when resulting from voluntary exposure by an insured to the sun's rays, even though an accident, see *Ismay, Imrie & Co., v. Williamson* [1908] A.C. 437, has been generally held not to have been caused by external accidental means.

291 U.S. at 495-96, 54 S.Ct. 461.

Justice Cardozo dissented. "A cause," he wrote, "does not cease to be violent and external because

---

[1]Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

the insured has an idiosyncratic condition of mind or body predisposing him to injury .... Here the complaint alleges that the idiosyncrasy was not a physical or mental disease, and that it appeared from autopsy that there was no bodily infirmity or disease which could have been a contributing cause of death.  Since the case is here on demurrer, those allegations must be taken as true." *Id.* at 498, 54 S.Ct. 461.  Cardozo then turned to the contending legal principles as they applied to the case before the Court:

> 2. Sunstroke, though it may be a disease according to the classification of physicians, is none the less an accident in the ordinary speech of men .... The suddenness of its approach and its catastrophic nature ... have made that quality stand out when thought is uninstructed in the mysteries of science .... Violent it is for the same reason, and external because the train of consequences is set in motion by the rays of the sun beating down upon the body, a cause operating from without.

> "In my view this man died from an accident.  What killed him was a heat-stroke coming suddenly and unexpectedly upon him while at work.  Such a stroke is an unusual effect of a known cause, often, no doubt, threatened, but generally averted by precautions which experience, in this instance, had not taught.  It was an unlooked for mishap in the course of his employment.  In common language, it was a case of accidental death."  Per Loreburn, L. C., in *Ismay, Imrie & Co., v. Williamson, supra.*

> 3. The attempted distinction between accidental results and accidental means will plunge this branch of the law into a Serbonian Bog. "Probably it is true to say that in the strictest sense and dealing with the region of physical nature there is no such thing as an accident."  Halsbury, L. C., in *Brinton's v. Turvey,* L.R. [1905] A.C. 230, 233 .... On the other hand, the average man is convinced that there is, and so certainly is the man who takes out a policy of accident insurance.

*Id.* at 498-99, 54 S.Ct. 461.

In *Landress* Cardozo stood alone.  His elegant, ominous and obscure warning of the menace that lurked in a Serbonian Bog—a type of bog not locatable in *Black's Law Dictionary* or in *Words and Phrases*[2]—was lost on his colleagues.  But in subsequent decades many state courts—a number of them

---

[2]"Serbonian Bog" is "[John] Milton's name for Lake Sarbonis in Lower Egypt, a marshy tract (now dry) covered with shifting sand.  Hence used allusively." II *The Compact Edition of the Oxford English Dictionary* 2735 (Oxford University Press 1971).  Milton's reference to the Bog appears in the sentence that comprises lines 587-95 of Book II of *Paradise Lost:*

> Beyond this flood a frozen Continent
>
> Lies dark and wilde, beat with perpetual storms
>
> Of Whirlwind and dire Hail, which on firm land
>
> Thaws not, but gathers heap, and ruin seems
>
> Of ancient pile;  all else deep snow and ice,
>
> A gulf profound as that *Serbonian* Bog
>
> Betwixt *Damiata* and mount *Casius* old,
>
> Where Armies whole have sunk:  the parching Air

clearly influenced by Cardozo's gloomy admonition (*e.g.,* the Colorado Supreme Court, per Chief Justice Burke: "[W]hatever kind of bog that is, we concur," *Equitable Life Assur. Soc. v. Hemenover,* 100 Colo. 231, 67 P.2d 80, 81 (1937))—have tended to collapse "accidental means," "accident," "accidental result," "accidental injury," "accidental death," and other formulations, into a unitary legal concept pursuant to which "the term 'accidental' is equally descriptive of means which produce effects which are not their natural and probable consequences, as it is of means which are wholly unexpected." Lee R. Russ & Thomas F. Segalla, 10 *Couch on Insurance 3d* § 139:22 (1998 ed.).

As of today, the jurisdictions, of which Georgia is one, that continue to adhere to "accidental means" as a category of accident insurance liability distinct from, and more restrictive than, other categories of accident insurance liability are in the minority. *Id.* at § 139:21. But it does not seem to be a small minority. In 1994, the California Supreme Court, in a lengthy opinion by Justice George announcing (over vigorous dissent) continued allegiance to "accidental means," noted that, "as of 1992, 22 jurisdictions, including California, expressly recognized the distinction between 'accidental means' and 'accidental death' (3 Harnett & Lesnick, [The Law of Life and Health Insurance], § 7.03[1], pp. 7-24—7-29; *id.,* (1992 supp.) p. 5), whereas 25 jurisdictions expressly have rejected or repudiated this distinction. (3 Harnett & Lesnick, *supra,* § 7.06[1], pp.7-112-7-116)." *Weil v. Federal Kemper Life Assurance Co.,* 7 Cal.4th 125, 27 Cal.Rptr.2d 316, 866 P.2d 774, 781 (1994).[3] Justice George also noted that the First Circuit, in an ERISA case—*Wickman v. Northwestern Nat. Ins. Co.,* 908 F.2d 1077 (1st Cir.), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990)—had rejected "accidental means."

---

Burns frore, and cold performs th' effect of Fire.

*The Poetical Works of John Milton,* 215 (W. Skeat ed., Oxford University Press, 1938).

It appears that insurance law is not the only legal realm that may have within its confines a Serbonian Bog. *See Texas v. Cobb,* 532 U.S. ----, 121 S.Ct. 1335, --- L.Ed.2d ---- (2001), in which Justice Breyer, in dissent, characterized a constitutional test adopted by the Court, in overturning the Texas Court of Criminal Appeals' reversal of a murder conviction, as so amorphous as to be likely to prove "the criminal law equivalent of Milton's 'Serbonian Bog ... Where Armies whole have sunk.' " *Id.* at ----, 121 S.Ct. 1335.

[3]Justice Mosk, joined by Justice Kennard, filed a dissent in *Weil* substantially longer than the court's lengthy opinion; the dissent urged abandonment of "accidental means." Both the dissent and the opinion of the court treated Cardozo's *Landress* dissent as a central ingredient of the jurisprudential debate. The focus of the *Weil* debate was whether death resulting from an overdose of cocaine was covered by a life insurance policy's "Additional Accidental Death Benefit" rider. The rider provided coverage for "loss of life as the direct result of bodily injury, independent of all other causes, effected solely through external, violent and accidental means."

In *Wickman,* the decedent, Paul Wickman, fell to his death from a highway bridge to railroad tracks forty or fifty feet below. When last seen, the decedent was "standing on the outside of the bridge's guardrail, holding on to it with only his right hand." *Id.* at 1080. Whether Paul Wickman slipped or jumped could not be determined. After the claim filed by Mary Jane Wickman (the decedent's widow, and the beneficiary of his group accidental death and dismemberment policy) was denied by the insurance carrier, she brought a diversity action against the carrier in the United States District Court for Massachusetts. Because the group policy was one in which Paul Wickman had been enabled to participate as an incident of his employment, Mary Jane Wickman's state law contract claim on the policy was dismissed and the suit went forward not as a diversity case but as a federal question case arising under ERISA. After a bench trial, the magistrate judge handling the case dismissed the suit, concluding that Paul Wickman's death was not an accident within the meaning of policy terms defining an "accident" as "an unexpected, external, violent, and sudden event." In the view of the magistrate judge, "Mr. Wickman knew or should have known that serious bodily injury or death was a probable consequence substantially likely to occur as a result of placing himself outside of the guardrail and hanging on with one hand." *Id.* at 1081. On appeal, in addressing the question whether the magistrate judge had correctly determined that the decedent's death was not an accident within the meaning of the policy, the First Circuit observed that "we, of course, first look at the contract"; but the court found that the contract language definition of "accident"—"an unexpected, external, violent, and sudden event"—was "somewhat less than dispositive." *Id.* at 1084. The court explained: "It is undisputed that the fall was external, violent, and sudden, but the parties disagree over whether it was unexpected .... The question comes down to what level of expectation is necessary for an act to constitute an accident; whether an intentional act proximately resulting in injury or only the ultimate injury itself must be accidental." *Id.* at 1085. Having framed the question in this way, the court explored the "accidental means"/"accidental result" dichotomy and rejected "accidental means." "We elect to pursue a path for the federal common law which safely circumvents this Serbonian Bog." *Id.* at 1086. Nonetheless, the court went on to determine that the judgment of the magistrate judge was not erroneous: "[W]e conclude that this case is governed under ERISA, and that applying federal common law under ERISA, Paul Wickman's death did not constitute an accident within the terms of his group accident insurance policy. Wickman either subjectively expected serious injury, or the evidence was inconclusive as to his subjective expectation. Objectively, he reasonably should have expected serious injury when he climbed over the guardrail and suspended himself high above

the railway tracks below by hanging on to the guardrail with only one hand." *Id.* at 1089. Thus, whether or

not her claim was scrutinized through the prism of "accidental means," Mary Jane Wickman could not

prevail.[4]

---

[4]In 1994—four years after *Wickman*—the United States District Court for the Western District of Arkansas, citing *Wickman,* stated that "[t]he means-result distinction has been rejected in ERISA cases." *Parker v. Danaher Corporation,* 851 F.Supp. 1287, 1292 (W.D.Ark.1994). Timothy Parker died of "autoerotic asphyxiation"—the unintended consequence of what is apparently a not uncommon "practice...described as an act of autoerotic stimulation by means of a noose tightened around the neck for the purpose of temporarily restricting the supply of oxygen to the brain in an attempt to intensify the sensations of masturbation." *Id.* at 1289. Mary Faye Parker (the decedent's mother and his beneficiary under an employer-provided group life insurance policy) was paid $10,000 of standard life insurance benefits, but her claim for an additional $10,000 under the accidental death provisions of the policy—death pursuant to "bodily injury caused by an accident...resulting directly and independently of all other causes in loss covered by this policy"—was rejected. On *de novo* review the district court found in plaintiff's favor. "We agree with the *Wickman* court that the means-result distinction should not be adopted in ERISA cases. However, we find that the *Wickman* subjective/objective analysis sheds little light in an area of the law already unduly complicated by reference to various artificial distinctions. Rather, we believe it more appropriate to accord the term 'accident' its natural meaning .... In this case, it is undisputed that the insured did not expect to die as a result of performing the autoerotic act.... [W]e believe that in the common understanding of man Timothy Parker's death would be regarded as accidental." *Id.* at 1295. Thus, the *Parker* court, following its ERISA-based rejection of "accidental means," went on to conclude that the denial of Mary Faye Parker's accidental death benefits claim was erroneous. But—quite apart from the fact that the events leading to the death of Timothy Parker were entirely unlike the events leading to the death of Walter Buce—*Parker* sheds little light on the case at bar for the reason that *Parker* was an instance of *de novo* review of the denial of a benefits claim.

        Unlike *Parker, Wickman,* as we have noted, was not a case in which the rejection of "accidental means" analysis had impact on the court's decision, for the First Circuit ruled that Paul Wickman's death was not an "accident" even under the broader concept of "accident" that the court deemed applicable. We think that the vital aspect of the First Circuit's approach in *Wickman* is reflected in the manner in which the Seventh Circuit built upon *Wickman* in *Cozzie v. Metropolitan Life Insurance Company,* 140 F.3d 1104 (7th Cir.1998). *Cozzie* is an ERISA accidental death benefits case essentially indistinguishable on its facts from the case at bar:

        On November 6, 1994, Mr. Cozzie was killed in a car accident. According to investigators, Mr. Cozzie's vehicle was found overturned in a field, where it had come to rest, after missing a curve in the road, striking an embankment and rolling over three times. Mr. Cozzie had a blood alcohol level of .252%. This amount is more than 2+ times the legal limit under Illinois law at the time of the incident. The cause of death stated in the coroner's report was asphyxiation as a result of the car's resting on Mr. Cozzie. There were no witnesses to the accident other than Mr. Cozzie's impaired condition.

*Id.* at 1106 (footnote omitted).

The district court, applying "arbitrary and capricious" review, granted summary judgment in favor of the insurance carrier. The Seventh Circuit affirmed. Drawing on *Wickman,* the *Cozzie* court said:

        Our colleagues in the First Circuit, in a thoughtful survey of the difficulties encountered by modern courts in developing a limiting principle to the term "accident," have suggested that, in giving meaning to the term "accident," we first ask whether the insured believed that the conduct at issue would result in the sort of injury that was sustained. *See Wickman v. Northwestern Nat. Ins. Co.,* 908 F.2d 1077, 1088 (1st Cir.), *cert. denied,*

In *Wickman,* as noted above, the term "accident", in an ERISA-governed group policy, was defined as an "unexpected, external, violent, and sudden event"—a definition the First Circuit charitably described as "somewhat less than dispositive." In circumstances of this sort—where the crucial terms of an accident policy are defined with surpassing vagueness, and the policy contains no general guidance as to the construction of those terms—we think that to deploy the federal common law of ERISA to give some unity to the concept of "accident" is sound judicial policy. Concretely, we think that, in the case before it, the First Circuit was on eminently sound ground in ruling out "accidental means" and focusing instead on the objectively reasonable expectations of a person in the perilous situation that the decedent had placed himself in.

*Wickman* 's rejection of "accidental means" does not, however, rule the case of Walter Buce. In the case at bar, the vague terms of the policy—"bodily injury caused by an accident ... and resulting directly and independently of all other causes in loss covered by the policy"—are given cognizable doctrinal context by another provision of the policy, the directive that "[t]he Plan is to be interpreted in accordance with the laws of the State of Georgia." Georgia—as this court held in *Laney, supra*—is an "accidental means" jurisdiction. *Laney* was decided in 1985, the year that Walter Buce elected to become a participant in NSI's Personal Accident Insurance Plan. In *Laney* the decedent's widow brought suit, based on her husband's death from over-consumption of alcohol (" 'acute ethanol intoxication (poisoning)' "), under a policy providing coverage for "loss ... resulting directly and independently of all other causes from bodily injuries caused by accident." In affirming the district court's grant of summary judgment in favor of the carrier, we addressed the meaning

498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990). If the insured did not believe that the result would occur, we must consider whether such an estimation can be considered reasonable. If the expectations were objectively unreasonable, then injuries from death resulting therefrom are not accidental. *Id.*

Employing this approach to defining "accident," other courts have reached the conclusion that a death that occurs as a result of driving while intoxicated, although perhaps unintentional, is not an "accident" because that result is reasonably foreseeable. *See Miller v. Auto-Alliance Int'l, Inc.,* 953 F.Supp. 172, 176 (E.D.Mich.1997) (upholding MetLife's denial of AD&D benefits because definition of "accident" used—that death or injury resulting from driving while intoxicated reasonably should have been expected—was not arbitrary and capricious); *Fowler v. Metropolitan Life Ins. Co.,* 938 F.Supp. 476, 480 (W.D.Tenn.1996) (same); *cf. McLain v. Metropolitan Life Ins. Co.,* 820 F.Supp. 169, 178 (D.N.J. 1993) (upholding MetLife's denial of AD&D benefits and its definition of "accident" as not arbitrary and capricious in finding that death resulting from cocaine use was not accidental because insured reasonably should have expected death to occur).

*Id.* at 1109-10.

of "caused by accident" (the phrase which links Pat Laney and Walter Buce) under Georgia law. We reviewed "accidental means" case law in Georgia and neighboring jurisdictions. We noted that "[l]eading commentators on insurance law ... equate 'caused by accident' and 'accidental means.' " 757 F.2d at 1192. And we then said: "Finally, grammatical construction suggests that the two terms, 'caused by accident' and 'accidental means,' are synonymous and not the same as 'accidental injury.' In the phrase 'accidental means,' the word accidental is an adjective describing the quality of the events precipitating the ultimate result. The focus is on the occurrence or happening which produces the result, not the result itself. Similarly, in the phrase 'bodily injuries caused by accident,' the qualifier limits the cause of the harm to those circumstances where the result, i.e., the injury, is due to an unexpected, unforeseen or unintentional event." *Id.* In the case at bar, the July 11, 1997 letter of Allianz's attorney to Patricia Buce's attorney, John Robinson, giving the reasons for the carrier's denial of Mrs. Buce's claim, is in harmony with this court's explication in *Laney* of Georgia law. Wrote Allianz attorney Douglas Campbell: "This is an accident policy which, as applicable to this particular claim, provides payment of benefits where loss of life is due to bodily injury caused by an accident and resulting directly and independently of all other causes in death. As such, it is an 'accidental means' policy which requires that, in the act which preceded the injury, there must have occurred something sudden, unexpected and unforeseen." Thus, in the light of the express directive of the policy that it "is to be interpreted in accordance with the laws of the State of Georgia," we conclude that Allianz's decision to deny the claim made by Patricia Buce survives " 'enhanced arbitrary and capricious' review."[5]

Citing three cases that have declined to enforce choice-of-law provisions in ERISA-regulated plans, Judge Carnes, in his concurring opinion, raises—but does not undertake to resolve—the question whether the common law of ERISA operates preemptively to preclude enforcement of the agreement of the parties to the insurance contract to utilize principles of Georgia law as the standards by which to determine the carrier's liability. There is, of course, no question that ERISA's preemptive authority sweeps broadly to preclude the application of provisions of state law (statutory or decisional) that would undercut the uniform

---

[5]In the case at bar, the carrier's determination that Walter Buce's death was not an "accident" would clearly have satisfied the "arbitrary and capricious" review exercised by the Seventh Circuit in *Cozzie v. Metropolitan Life Insurance Company,* 140 F.3d 1104 (7th Cir.1998), the factually almost congruent case discussed in footnote 4, *supra,* for the reasons cogently articulated by the *Cozzie* court. Moreover, we think it strongly arguable that the *Cozzie* analysis, applied to the case at bar via the requisite "enhanced arbitrary and capricious" review, would likewise have led to the conclusion that the carrier's denial of benefits was warranted. However we need not resolve that issue, since, for the reasons given in the text of this opinion, we conclude that the carrier was warranted in denying Patricia Buce's claim on the basis of its "accidental means" analysis.

implementation of ERISA's text or its attendant case law. *See Egelhoff v. Egelhoff,* --- U.S. ----, 121 S.Ct. 1322, --- L.Ed.2d ---- (2001). The rationale of ERISA's preemption of otherwise applicable state law mandates is the rationale that underlies all federal preemption—namely, that in enforcing federal law the directives of the supreme federal sovereign take precedence over directives of the not-supreme state sovereign. But when private contracting parties formulate a choice-of-law provision that, with a view to defining liability, incorporates state legal doctrines, those doctrines are not emanations of state authority, they are simply a convenient shorthand for what the private contracting parties wish to agree to. The pertinent question to be addressed with respect to such a choice-of-law provision is, therefore, not a question of the possible irreconcilability of directives issuing from two different sovereignties—one federal and one state. The pertinent question, in short, is not one of "preemption" in the conventional sense of that term. The pertinent question is whether the principles of liability agreed upon by the parties are inconsistent with the language of ERISA or the policies that inform that statute and animate the common law of the statute.

In the case at bar, we have been pointed to no ERISA statutory language, and no cases formulating the common law of ERISA, which suggest that the agreement of the parties to utilize Georgia doctrine would be subversive of ERISA policy.[6] From Cardozo onward, "accidental means" has been the subject of

---

[6]The cases cited in Judge Carnes's concurring opinion—*Prudential Insurance Company of America v. Doe,* 140 F.3d 785 (8th Cir.1998); *Morton v. Smith,* 91 F.3d 867 (7th Cir.1996); and *In re Sears Retiree Group Life Insurance Litigation,* 90 F.Supp.2d 940 (N.D.Ill.2000)—contain language dismissive of choice-of-law provisions found to contravene aspects of the common law of ERISA.

    In *Prudential Insurance* the Eighth Circuit held that a choice-of-law provision invoking Illinois law, and hence the Illinois doctrine of *contra proferentem,* could not obviate application of a previously established circuit ruling that a Missouri *contra proferentem* "rule of construction violates the provisions of ERISA," *Brewer v. Lincoln National Life Insurance Co.,* 921 F.2d 150, 153 (1990).

    In *Morton v. Smith* the Seventh Circuit, in *dictum,* rejected an argument that ERISA trustees would be bound by a choice-of-law provision to exercise their discretionary authority in conformity with Illinois law, had such a provision been contained in the plan, which the court found it had not; but the court also went on to "note that the rule of contract interpretation [i.e., reference to state law] that Morton invokes here can sometimes be relevant to the interpretation of an ERISA benefit plan". 91 F.3d at 871 n. 1. The court then pointed to its prior ruling in *Phillips v. Lincoln National Life Insurance Co.,* 978 F.2d 302, 311-313 (7th Cir.1992), that application of the Illinois *contra proferentem* rule in the interpretation of an ERISA-regulated plan was compatible with the common law of ERISA—a construction of the common law of ERISA which, as the Eighth Circuit noted in *Prudential Insurance,* is in conflict with the Eighth Circuit rule announced in *Brewer* and reaffirmed in *Prudential Insurance.*

    *Sears Retiree* was a class action alleging breach of an ERISA-regulated life insurance plan through reductions of benefits for retired employees. The defendants invoked reservation of rights clauses in the policy as justifying the benefit-reductions, and the court noted that, "[i]n case after case, in this circuit and others, courts have held that employee benefit plans containing

formidable criticism. But many jurisdictions—Georgia among them—continue to adhere to the doctrine. Given that the Personal Accident Insurance Plan at issue in this case was designed for the employees of a Georgia company, it is difficult to see that the parties' decision to utilize Georgia doctrine was inappropriate. "Where a choice of law is made by an ERISA contract, it should be followed, if not unreasonable or fundamentally unfair." *Wang Laboratories, Inc. v. Kagan,* 990 F.2d 1126, 1128-29 (9th Cir.1993).

The doctrine of "accidental means" may no longer be fashionable, but its use in this Georgia benefits plan can hardly be characterized as "unreasonable", let alone "fundamentally unfair". Accordingly, the District Court was without authority to determine that it should be disregarded. "The parties to accident insurance contracts have the right and power to contract as to the accidents and risks for which the company shall and shall not be liable, subject to the restraints of public policy, and the courts may not make new or different contracts for them." 10 *Couch on Insurance* 3d § 139:8 (1998 ed.) (footnotes omitted).

### Conclusion[7]

For the reasons given above, the judgment of the District Court is REVERSED and the cause REMANDED with directions to enter judgment dismissing the suit of plaintiff-appellee Patricia Buce against defendant-appellant Allianz.

REVERSED and REMANDED.

BARKETT, Circuit Judge, concurring, in which POLLAK, District Judge, joins.

I concur in the majority opinion and write only to expand on the question of whether an ERISA plan

---

reservation of rights clauses do not give rise to vested welfare benefits." 90 F.Supp.2d at 944-45. The plaintiffs countered that Illinois law barred reductions in retiree life insurance benefits, and contended that Illinois law, was controlling by virtue of a policy provision describing the policy as "an Illinois contract" which "will be construed in accordance with the laws of that jurisdiction." 90 F.Supp.2d at 950. The court, citing *Tormey v. General American Life Ins. Co.,* 973 F.Supp. 805 (N.D.Ill.1997), and *Morton v. Smith,* rejected plaintiffs' contention.

Each of the foregoing cases illustrates a circumstance in which a court found that application of a particular state law rule, even if agreed to by the parties, would not be compatible with the law of ERISA. But none of these discrete ERISA cases—and no other case of which we are aware—tends to establish the proposition that application of Georgia's "accidental means" doctrine to the Georgia-based ERISA benefits dispute at bar would undercut established principles of ERISA law. As noted above, in *Morton v. Smith* the Seventh Circuit pointed out that the contracting parties' reliance on state law doctrines "can sometimes be relevant to the interpretation of an ERISA benefit plan." No showing has been made that the case at bar is not such an instance.

[7]In view of our determination that Allianz's denial of benefits based on Georgia's "accidental means" doctrine was warranted, we have no occasion to consider whether, on the facts of this case, Allianz's denial of benefits was, in the alternative, properly based on the policy's intoxication exclusion provision.

provider and its insured may agree that the plan's terms are to be construed in accordance with state law.

I start with the principle that the parties to a contract have the right to define the terms of that contract. Thus, in the insurance context, parties are free to agree upon the extent of coverage, to agree to limit insurance liability through exclusions or other contingencies and to agree to the manner in which the disputed meaning of contractual terms should be decided.[1] The question before this Court is whether ERISA precludes the parties to an agreement from using state law to define an ERISA contract's terms. In the absence of any compelling rationale to the contrary, I am not persuaded that ERISA sweeps so broadly.

To determine the extent of Congress' preemptive intent, courts first look to the language of the statute's preemption clause. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95-100, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). In this case, ERISA's preemption clause, 29 U.S.C. § 1144(a), contains no language that specifically prohibits the application of the choice of law agreement in this case.[2] The preemption language of ERISA, although broad, does not address the question of whether a choice of law agreement may be enforced. It simply provides that:

> [e]xcept as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144(a). To answer the question presented here, we must discern the meaning of the terms "relates to" and "State laws."

The Supreme Court has recognized that ERISA's preemption clause is "not a model of legislative drafting," *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 740, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 46, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), and has

---

[1]I recognize that an ERISA insurer's freedom to contract may be partially constrained by mandatory state laws for, when Congress passed ERISA, it recognized that states may create laws designed specifically to regulate the insurance industry, and an ERISA insurer is required to adhere to these laws as long as they fall within ERISA's "savings clause." *See UNUM Life Ins. Co. of Am. v. Ward,* 526 U.S. 358, 363, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999) (discussing 29 U.S.C. § 1144(b)(2)(A)). To fall under the protection of the "savings clause" the state law must: (1) from "a common-sense view of the matter ... regulate[ ] insurance"; (2) "ha[ve] the effect of transferring or spreading a policyholder's risk"; (3) concern a practice "integral ...[to] the policy relationship between the insurer and the insured;" and (4) concern a "practice ... limited to entities within the insurance industry." *Id.* at 367, 119 S.Ct. 1380. However, the limits the "savings clause" imposes on an ERISA insurer's freedom to contract have no bearing on whether an ERISA insurer may voluntarily choose to adopt other state law standards to govern the interpretation of an ERISA policy's terms.

[2]Indeed, there is nothing in ERISA generally that addresses how contractual terms such as "accident" should be defined or interpreted.

provided guidance to resolve the question before us. In *De Buono v. NYSA-ILA Medical and Clinical Services Fund,* the Court explained:

> in our earlier cases, we noted that the literal text of [ERISA's preemption clause] [wa]s "clearly expansive." (citing by example *New York State Conference of Blue Cross and Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) ("*Travelers* ")). But we were quite clear ... that the text could not be read to "extend to the furthest stretch of its indeterminacy, [or] for all practical purposes preemption would never run its course," for "[r]eally, universally, relations stop nowhere."

520 U.S. 806, 813, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997) (citing H. James, Roderick Hudson xli (New York ed., World's Classics 1980)). *See also California Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc.,* 519 U.S. 316, 335, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) ("*Dillingham* ") (explaining that application of the preemption clause "was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else.")

In *De Buono,* the Supreme Court noted that in the early ERISA preemption clause cases, the state laws at issue had a clear "connection with or reference to ERISA benefit plans." 520 U.S. at 813, 117 S.Ct. 1747 (internal citations omitted). Thus, in those cases it was "not ... necessary to rely on the expansive character of ERISA's literal language in order to find preemption." *Id.* Ultimately, when confronted with the question of whether Congress intended ERISA's "relates to" language to modify "the starting presumption that Congress does not intend to supplant state law," the Supreme Court explained that it "unequivocally concluded that it did not ..." *Id.*

In *De Buono,* the Supreme Court also acknowledged that its "prior attempt[s] to construe the phrase 'relate[s] to' d[id] not give ... much help [in] drawing the line" between the issues preempted by § 1144(a) and those unaffected by the provision. *De Buono,* 520 U.S. at 813, 117 S.Ct. 1747 (citing *Travelers,* 514 U.S. at 655, 115 S.Ct. 1671). However, the Supreme Court explained that:

> [i]n order to evaluate whether the normal presumption against preemption has been overcome in a particular case, we [have] concluded that we "must go beyond the unhelpful text [in § 1144(a) ] and the frustrating difficulty of defining its key term[s], and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive."

*De Buono,* 520 U.S. at 813-14, 117 S.Ct. 1747 (citing *Travelers,* 514 U.S. at 656, 115 S.Ct. 1671). The Supreme Court reiterated this view in *Dillingham,* noting that the statute at issue there, a wage law, was no different from myriad state laws in areas traditionally subject to local regulation, and when Congress enacted

the ERISA preemption clause, it could not possibly have intended to eliminate all of these laws.[3] *Dillingham,* 519 U.S. at 334, 117 S.Ct. 832.

In my view, nothing in ERISA suggests that Congress intended to preempt the agreement of the parties here. Rather, when Congress enacted ERISA, it was concerned about the enormous number of benefit plans which were receiving preferential tax treatment, but were not protecting long term employees from losing anticipated retirement benefits because the plans lacked vesting provisions. *See* 29 U.S.C. § 1001(a). It was also concerned about how many employee benefit plans contained inadequate minimum protective standards and, as a result, were unable to pay promised benefits or were forced to terminate the plans before the requisite funds had been accumulated. *Id.* Congress, therefore, created a statute which would standardize "disclosure and reporting [obligations] to participants and beneficiaries ... [with regard to] financial and other information"; establish "standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans"; create "vesting standards for employees with significant periods of service"; erect minimum funding standards for plans and require plan termination insurance; and "provid[e] for appropriate remedies, sanctions, and ready access to the federal courts." 29 U.S.C. § 1001(b) & (c).

When one looks at ERISA's preemption clause in light of Congress' goals for the entire statute, it seems clear that Congress was simply ensuring that no state regulation would supersede the protections provided by the statute's provisions. Therefore, consistent with these goals, the phrase "State laws" in § 1144(a) refers to the conflicting legislative acts of a state (and any court interpretation of those legislative acts). There is nothing in the goals and purposes of ERISA that extends to non-conflicting agreements to be bound by the decisional law of state courts in interpreting ambiguous terms in their contracts.

Indeed, no Supreme Court case has addressed ERISA preemption in light of private agreements concerning state law. Rather, all of the Supreme Court's ERISA preemption cases address the question of whether state legislative enactments affect the regulation, operation, structure and policy concerns of ERISA, or whether state law causes of action conflict with the statute's enforcement mechanisms. *See Egelhoff v. Egelhoff,* --- U.S. ----, 121 S.Ct. 1322, --- L.Ed.2d ---- (March 21, 2001) (holding that a Washington state law which automatically revoked designation of spouse as plan beneficiary upon divorce was preempted as

---

[3]Specifically, the *Dillingham* Court explained, "we could not hold pre-empted a state law in an area of traditional state regulation based on so tenuous a relation without doing grave violence to our presumption that Congress intended nothing of the sort. We thus conclude that California's prevailing wage laws and apprenticeship standards do not have a 'connection with,' and therefore do not 'relate to,' ERISA plans." *Dillingham,* 519 U.S. at 334, 117 S.Ct. 832.

applied to ERISA plans because it conflicted with ERISA's requirement that a plan be administered according to the plan's terms); *UNUM,* 526 U.S. 358, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999) (holding, *inter alia,* that California agency law establishing that a employer was an agent of the insurer providing its insurance policies was preempted by ERISA); *Boggs v. Boggs,* 520 U.S. 833, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997) (holding that ERISA preempted a Louisiana state law regulating community property when the insured sought to use a testamentary transfer to convey his interest in an ERISA plan); *De Buono,* 520 U.S. 806, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997) (holding that ERISA did not preempt a New York state tax on the gross receipts of health care facilities operated by an ERISA fund); *Travelers,* 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) (holding that ERISA did not preempt a New York statute requiring hospitals to collect surcharges from patients covered by a commercial insurer but not from a patient insured by a Blue Cross Blue Shield plan); *John Hancock Mut. Life Ins. Co. v. Harris Trust and Sav. Bank,* 510 U.S. 86, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993) (recognizing that ERISA's fiduciary duties provisions do not always preempt state law obligations for fiduciaries managing benefit plans); *Dist. of Columbia v. Greater Washington Bd. of Trade,* 506 U.S. 125, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992) (holding that the District of Columbia Worker's Compensation Equity Amendment Act explicitly referred to ERISA and was therefore preempted); *Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (holding that a Texas state law claim for wrongful discharge was preempted when it was based on the allegation that the termination was motivated by the employer's desire to avoid payment of ERISA benefits); *FMC Corp. v. Holliday,* 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990) (holding that ERISA preempted application of the Pennsylvania Motor Vehicle Financial Responsibility Law to an ERISA governed health care plan); *Massachusetts v. Morash,* 490 U.S. 107, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989) (holding that Massachusetts criminal statute requiring employers to pay employees for unused vacation time was not preempted by ERISA because it did not concern an ERISA benefit plan); *Mackey v. Lanier Collection Agency & Service, Inc.,* 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (holding that a Georgia state law specifically protecting ERISA benefits from garnishment was preempted by ERISA and that ERISA benefits could be garnished under generally applicable Georgia law); *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (holding that Maine law requiring one time severance payment for employees of closed plants was not preempted by ERISA); *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (holding that plaintiff's Michigan tort and contract claims for wrongful denial of ERISA benefits

were preempted by ERISA); *Pilot Life,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (holding that Mississippi state law claims for wrongful denial of ERISA plan benefits were preempted by ERISA); *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (holding that Massachusetts insurance law requiring certain benefits was not preempted by ERISA because it fell within ERISA's "savings clause"); *Shaw,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (holding that ERISA preempted New York Human Rights Law to the extent that it imposed conflicting insurance obligations than required under ERISA but that New York Disability Law was not preempted if not applied to ERISA plans); *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981) (holding that New Jersey statute barring certain calculations for pension benefits was preempted under ERISA).

The only circuit court which has addressed a case similar to this one is the Eighth Circuit in *Prudential Insurance Company of America v. Doe,* 140 F.3d 785, 790-91 (8th Cir.1998), which relied on the earlier case of *Brewer v. Lincoln National Life Insurance Company,* 921 F.2d 150, 153-54 (8th Cir.1990).[4] In *Prudential,* the Eighth Circuit declined to enforce a choice of law agreement providing for Illinois law to govern the interpretation of the term "mental illness" in the ERISA policy. The *Prudential* Court, without explanation, simply stated, "[a]lthough choice of law provisions may be relevant in a diversity action, we are required to apply federal common law when deciding federal questions. In light of the broad preemptive

_____

[4]I do not find ERISA cases concerning disputes about statutes of limitations analogous, because these cases are decided under the federal common law rule permitting the courts to select a statute of limitations from the law of the forum when a federal cause of action does not have one. *See Wilson v. Garcia,* 471 U.S. 261, 268, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) (explaining that when Congress fails to provide a statute of limitations for a federal cause of action it is Congress' intent for courts to apply the statute of limitation from the most analogous cause of action under state law). Three courts have relied on this rule as an explanation for why they would not select a statute of limitations for a party's ERISA claim based on the law indicated by the choice of law agreement in the parties' ERISA contract. *See, e.g., Central States Southeast & Southwest Areas Pension Fund v. Kraftco, Inc.,* 799 F.2d 1098, 1104-05 (6th Cir.1986) (explaining that "when Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so."). *See also Gluck v. Unisys,* 960 F.2d 1168, 1180 (3d Cir.1992) (applying rule and explaining that "choice of law provisions in contracts do not apply to statutes of limitations, unless the reference is express."); *Robbins v. Iowa Builders, Co.,* 828 F.2d 1348, 1352-53 (8th Cir.1987) (following the same rule and commenting that choice of law provisions are irrelevant to an ERISA action because these provisions are only relevant to diversity cases). However, at least one court has concluded that the federal rule for selecting statutes of limitations can be suspended by the parties' choice of law agreement. *See Wang v. Kagan,* 990 F.2d 1126, 1129 (9th Cir.1993) (applying choice of law agreement in ERISA benefit plan to decide statute of limitations question because the provision was "not unreasonable" or "fundamentally unfair"). Because the federal common law rule for identifying statutes of limitations is independent of our concerns regarding whether one can elect to contract around the substantive definitions for policy terms under the federal common law of ERISA, I do not rely on these cases for my analysis.

scope of ERISA, the question of coverage ... is clearly one of federal law." *Id.* at 791. In the earlier *Brewer* case, the Eighth Circuit declined to apply a choice of law agreement in the same context stating, again without analysis, that ERISA's "preemption clause applies broadly to all state laws that have any direct or indirect relation to pension plans, even if they were not specifically designed for that purpose," and are only saved from preemption if they fall within ERISA's "savings clause." 921 F.2d at 153-54.

Neither *Prudential* nor *Brewer* offer any compelling rationale for why ERISA's preemption clause should be construed to wholly bar the general practice of agreements between insurers and insureds as to how their insurance policy's terms will be construed. Thus, I concur with Judge Pollak's assessment that ERISA's preemption clause does not bar the enforcement of a choice of law agreement, as long as the law applied does not conflict with ERISA's statutory language or policy goals.

CARNES, Circuit Judge, concurring in the result.

I concur in the reversal of the district court's judgment because I reach the same bottom line conclusion as the majority about Allianz's decision to deny Patricia Buce's claim for death benefits—the denial was not arbitrary and capricious under the heightened standard of review. But I arrive at that conclusion by a different route than the majority. The route the majority follows involves a holding that ERISA does not preempt state law definitions of plan terms when those definitions are incorporated into the plan by a choice-of-law provision. That holding on an important issue of first impression in this circuit may be correct. Or it may not be.

Some other courts appear to have decided the issue differently. Those other courts have held that ERISA's preemption provision, among the broadest ever drafted by Congress, does preempt state law specified in plan choice of law provisions. *See Prudential Ins. Co. of Am. v. Doe,* 140 F.3d 785, 790-91 (8th Cir.1998) (holding, in light of the "broad preemptive scope of ERISA," that "[t]he choice of law provision in the [benefits plan] does not alter the outcome here, for parties may not contract to choose state law as the governing law of an ERISA-governed benefit plan"); *Morton v. Smith,* 91 F.3d 867, 871 (7th Cir.1996) (dictum) (choice-of-law provision does not control because the "federal common law of ERISA preempts most state law in regulating the interpretation of benefit plans"); *In re Sears Retiree Group Life Ins. Litig.,* 90 F.Supp.2d 940, 950-51 (N.D.Ill.2000) ("A choice of law provision does not operate to waive the applicability of federal law regarding interpretation of an ERISA plan."). All of the cited decisions agree that choice of law provisions have no effect where, as here, the attempt is to choose state law as the source of

interpretation for the terms of an ERISA plan.

I find it unnecessary to decide the ERISA preemption issue the majority addresses, or any other issue relating to how the Plan term "caused by an accident" is defined, because in my view Mrs. Buce's claim is precluded by the Plan's intoxication exclusion. That exclusion provides that "[Allianz] shall not be liable for any loss sustained in consequence of the person whose injury is the basis of claim being intoxicated."

Mr. Buce was exceedingly intoxicated when he died—a posthumously drawn blood sample measured his blood alcohol content at .22 percent, more than twice the legal limit. *See* O.C.G.A. § 40-6-391(a)(5) (.10 legal limit). The circumstances of Mr. Buce's death are that while driving drunk on an Interstate highway at 2:00 a.m., he lost control of his automobile and struck a guard rail. There was no evidence of a mechanical problem, no visible hazards, and no skid marks. The weather was clear and the highway was straight. His death was tragic, but the circumstances of it are all too typical of the thousands of alcohol-related traffic deaths that occur on our highways each year. *See Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 451, 110 S.Ct. 2481, 2485-86, 110 L.Ed.2d 412 (1990) ("Drunk drivers cause an annual death toll of over 25,000 and in the same time span cause nearly one million personal injuries and more than five billion dollars in property damage.") (footnote omitted) (quoting 4 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 10.8(d), p.71 (2d ed.1987)). Mr. Buce's death represents a statistically predictable loss that the Plan in this case, like many other insurance policies, explicitly excludes. That exclusion is an independent, non-arbitrary basis that Allianz relied upon in denying death benefits.

The district court concluded that denying benefits on the basis of the intoxication exclusion was arbitrary and capricious for one reason: the 1985 summary plan description, the only one the Buces ever received, did not mention the Plan's intoxication exclusion. *Buce v. National Serv. Inds., Inc.,* 74 F.Supp.2d 1272, 1279-80 (N.D.Ga.1999). The district court reasoned that where a plan and a summary plan description are inconsistent, the terms of the summary description control. *Id.* at 1279. Here, the district court determined that the two were inconsistent because the Plan contained an intoxication exclusion which the summary plan description did not mention. *Id.* Accordingly, the court concluded that Allianz's denial of death benefits on the basis of that exclusion was arbitrary and capricious under our heightened standard of review. *Id.* at 1280.

ERISA contemplates that the summary plan description will be the employee's primary source of information regarding benefits, and employees are entitled to rely on the description contained in it. *See* 29

U.S.C. § 1022(a) ("The summary plan description ... shall be sufficiently accurate and comprehensive to reasonably apprise ... participants and beneficiaries of their rights and obligations under the plan."); 29 C.F.R. § 2520.102-2(a). We have held that when a plan and its summary description conflict, and the employee or beneficiary demonstrates the requisite reliance, the terms of that description determine her eligibility for benefits. *McKnight v. Southern Life & Health Ins. Co.,* 758 F.2d 1566, 1570 (11th Cir.1985). As we explained in *McKnight,* "It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document, and then proclaim that any inconsistencies will be governed by the plan. Unfairness will flow to the employee for reasonably relying on the summary booklet." 758 F.2d at 1570. The district court credited Mrs. Buce's testimony that if the summary plan description had not omitted mention of the intoxication exclusion, she would have requested that an immediate autopsy be performed on her husband. That testimony, the district court concluded, satisfied the requirement of reliance. *Buce,* 74 F.Supp.2d at 1279.

I disagree. Mrs. Buce's testimony showed reliance, but it did not show detrimental reliance. In my view, Mrs. Buce was required to go beyond a simple showing that she acted or failed to act in some respect because of the Summary Plan Description's omission of the intoxication exclusion. Reliance connotes detriment. While we have never squarely held that an employee or beneficiary must show that her reliance on a statement or omission in the summary plan description was detrimental, we have indicated that she must. In *Branch v. G. Bernd Co.,* 955 F.2d 1574 (11th Cir.1992), the terms of the plan specified an election period for obtaining continued coverage that differed from the election period given in the summary plan description. We held that the plan's terms, and not those of the summary plan description, governed the plaintiff's eligibility for benefits, because the plaintiff had provided "no evidence ... [that he had] ever read or relied on the summary." *Id.* at 1579-80. To be sure, the holding of *Branch* is simply that a plan trumps a summary plan description where there is no reliance at all, and there was no occasion to decide in that case whether the reliance required is detrimental reliance. *See also Collins v. American Cast Iron Pipe Co.,* 105 F.3d 1368, 1371 (11th Cir.1997) (plaintiff did not rely on faulty summary plan description because he did not read it until after he had filed his lawsuit).

But our discussion in *Branch* did provide an example of the kind of evidence that would satisfy the reliance requirement, and that example suggests that a showing that the reliance was detrimental is necessary in order to prevail on the basis of an omission in the summary plan description. We said:

> a beneficiary who receives a summary that omits the plan's limit on the election period could prove reliance with evidence that the beneficiary received and read the summary and failed to make a timely election based on the belief that there was no time limit.

*Branch,* 955 F.2d at 1579 n. 2. I believe the negative implication of that dicta is correct. An employee or beneficiary is not harmed by non-detrimental reliance, and we ought not disregard a plan's otherwise controlling terms because of an omission from a summary plan description in the absence of harm. *See Maxa v. John Alden Life Ins. Co.,* 972 F.2d 980, 984 (8th Cir.1992) ("[I]n order to recover for a faulty plan summary, appellant must ... show that [he] took action, resulting in some detriment, that [he] would not have taken had [he] known [that the terms of the plan were otherwise].") (internal quotes and citation omitted).[1]

Mrs. Buce has not made the required showing of detrimental reliance. Detrimental reliance or actual harm from a summary plan description's inconsistency with the plan can shown by evidence that because of that inconsistency the employee or beneficiary took or failed to take some action that prejudiced her claim for benefits under the ERISA plan. I accept the district court's credibility determination, and take as given that Mrs. Buce would have ordered an autopsy soon after her husband's death had the summary plan description informed her of the Plan's intoxication exclusion. I also accept her representation in this Court (although it stretches her testimony in the district court) that if she had known of the intoxication exclusion, she would have sought an investigation of the accident, an accident reconstruction, an examination of the vehicle, or all of those things. However, Mrs. Buce has provided no evidence that her failure to take any or all of those actions prejudiced her in regard to her claim for death benefits. We know Mr. Buce was extremely intoxicated when he died. We know the circumstances of the wreck. We also know that there is no evidence indicating that an autopsy, an accident reconstruction, or any additional investigation of the wreck would have pointed to anything other than the obvious, which is that serious injury or death are the all too predictable results of driving in a highly inebriated state. So, Mrs. Buce presented no evidence that

---

[1]Other courts have suggested the same proposition in dicta. *See Health Cost Controls of Ill., Inc. v. Washington,* 187 F.3d 703, 711 (7th Cir.1999) ("When ... the plan and the summary plan description conflict, the former governs ... unless the plan participant or beneficiary has reasonably relied on the summary plan description to his detriment."); *Stamper v. Total Petroleum, Inc.,* 188 F.3d 1233, 1243 (10th Cir.1999) ("[A]ppellants make no claim that they actually detrimentally relied on the SPD."). *But see Aiken v. Policy Mgmt. Sys. Corp.,* 13 F.3d 138, 141 (4th Cir.1993) (stressing that ERISA claimant must show *either* "significant reliance" or "possible prejudice"); *Edwards v. State Farm Mut. Auto. Ins. Co.,* 851 F.2d 134, 137 (6th Cir.1988) (claimant need not show detrimental reliance). Many of the courts that have considered this issue, however, have imposed the somewhat cryptic requirement that the employee or beneficiary show "some significant reliance upon, or possible prejudice flowing from, the faulty plan description." *Govoni v. Bricklayers, Masons and Plasterers Int'l Union of Am., Local No. 5,* 732 F.2d 250, 252 (1st Cir.1984); *see, e.g., Gridley v. Cleveland Pneumatic Co.,* 924 F.2d 1310, 1319 n. 8 (3d Cir.1991).

her reliance on the summary plan description's omission of the intoxication exclusion worked to the actual detriment of her claim.[2]

Detrimental reliance or actual harm from a summary plan description's inconsistency with the plan can also be shown by evidence that, but for the inconsistency, the employee or beneficiary would have obtained other insurance which would have paid benefits.  But there is absolutely no evidence that if the summary description had referred to the intoxication exclusion either Mr. or Mrs. Buce would have purchased some other insurance policy that did not have such an exclusion.

I join the majority's reversal of the district court's judgment which set aside Allianz's denial of Mrs. Buce's death benefits claim. I would, however, base that reversal on the Plan's intoxication exclusion, and not on an interpretation of the Plan's terms drawn from Georgia law applied through the choice-of-law provision.

---

[2]Mrs. Buce was given an opportunity in the district court to identify any detriment that she suffered from failing to take any steps she might have taken had she known of the intoxication exclusion.  For example, the following exchange took place at trial:

Q:      So you're not contending now that there is any specific thing or things that you think an autopsy would or might have revealed that might bear one way or another on this particular case;  is that what you're saying?

R:      I don't know what an autopsy would reveal.